## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

THOMAS C. AUSTIN

*Plaintiff*,

v.

CITY OF BRIDGEPORT,

*Defendant*.

No. 3:17-cv-01306 (MPS)

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Thomas C. Austin ("Austin") filed suit against the City of Bridgeport ("Bridgeport"). He alleges that Bridgeport terminated his employment in violation of his right to free speech under the First Amendment (count one); his right to due process under the Fourteenth Amendment (count two); his right to free speech under Connecticut General Statutes § 31-51q (count three); and his rights under the Bridgeport City Charter (count four). Bridgeport filed a motion for summary judgment on all counts. For the reasons set forth below, Bridgeport's motion is DENIED.

### I.  FACTS

The following facts, which are taken from the parties' Local Rule 56(a) statements and supporting exhibits, are undisputed unless otherwise indicated.

### A.  Austin's Hiring & Bridgeport's Civil Service System

During Mayor Finch's term in office, Deputy Director of Labor Relations Tom McCarthy asked Austin if he would be interested in working for Bridgeport as a Senior Labor Relations Officer. ECF No. 32-1 at ¶¶ 24, 27; ECF No. 38 at ¶¶ 24, 27. Austin submitted a cover letter and resume, and interviewed for the position with Director of Labor Relations Larry Osborne. ECF

No. 32-1 at ¶ 31; ECF No. 38 at ¶ 31. He did not go through a competitive civil service process or take a written test. ECF No. 32-1 at ¶¶ 35-36; ECF No. 38 at ¶¶ 35-36. He was hired and began serving in the position on July 3, 2012. ECF No. 32-1 at ¶¶ 1, 32; ECF No. 38 at ¶¶ 1, 32. Before taking the position, Austin had worked in private law practice doing real estate closings, criminal work, matrimonial law, and some employment law. ECF No. 32-1 at ¶ 28; ECF No. 38 at ¶ 28.

The Charter of the City of Bridgeport ("City Charter") delineates two types of civil service employees: classified and unclassified. ECF No. 32-1 at ¶ 9; ECF No. 38 at ¶ 9. These two types of employees are set out and defined in Section 205(a) of the City Charter:

> (a) The civil service of the city is hereby divided into the unclassified and classified service. The unclassified service shall comprise: (a) The mayor and all officers elected by the people; (b) all executive offices or positions specifically created by charter and the method of filling which is governed by specific and express provisions of the charter, including the civil service commissioners, superintendent of schools, assistant superintendent of schools, superintendent of the department of public welfare, with the exceptions hereinafter noted; (c) members of boards and commissions appointed by the mayor and serving without pay; (d) members of any board or commission appointed by, the city council; (e) all classes of teachers in the school system of the city, so far as their original appointments hereto are concerned; (f) the deputy director of public works, the assistant city treasurer, the assistant town clerk, the assistant city attorney and the assistant city engineer.
>
> The classified service shall include all other offices or positions existing at the time of the passage of this act or thereafter created, including all positions and offices in the police department, including that of chief of police, and all positions and offices in the fire department including that of fire chief.

ECF No. 38-1; Section 205(a). The parties agree that the position of Senior Labor Relations Officer does not fall into any of the unclassified categories enumerated in Section 205(a), ECF No. 32-2 at 26; ECF No. 38 at ¶ 5, and that the position came into existence after the adoption of the City Charter, ECF No. 32-1 at ¶ 14; ECF No. 38 at ¶ 14.

To establish a position in the classified service, Bridgeport city officials must follow the procedural requirements set out in Section 206(d) of the City Charter:

> Whenever the appointing authority of any department desires to establish a new permanent position in the classified service, the personnel director shall make or cause to be made an investigation of the need of such position and report his findings to the commission. If upon consideration of the facts the commission determines that the work of the department can not be properly and effectively carried on without the position, it shall classify and allocate the new position to the proper class after the position has been established by the city council. If the commission determines that the position is not necessary and that the work of the department can be properly and effectively carried on without the position, it shall promptly transmit such determination to the city council. Such determination by the commission shall be final unless the city council, within two months of the date of such disapproving action by the commission, shall by its duly enacted resolution approve the establishment of such position. In such event the final action of the city council shall be promptly transmitted to the commission and the commission shall allocate the position or positions therein  approved to its proper class in the classification plan. All classifications and allocations made pursuant to this subsection shall be based on the same procedure and formula called for in subsections (a) and (b) of this Section.

ECF No. 38-5 at 2-3; Section 206(d). The parties agree that these procedures were not followed with respect to the position of Senior Labor Relations Officer. ECF No. 32-1 at ¶¶ 12-14; ECF No. 38 at ¶¶ 12-14.

Unclassified employees either have set terms of office or serve at the pleasure of the Mayor. ECF No. 32-1 at ¶ 11; ECF No. 38 at ¶ 11. Those who serve at the pleasure of the Mayor may be terminated because of a change in administration. ECF No. 32-1 at ¶ 11; ECF No. 38 at ¶ 11. Classified employees cannot be terminated unless such termination is for "just cause," and the employee is given notice of the termination and an opportunity to appeal and be heard regarding the termination. ECF No. 32-1 at ¶ 10; ECF No. 38 at ¶ 10. Section 223 of the City Charter governs the termination of classified employees and provides, in relevant part, as follows:

> No person or employee holding a permanent office or position in the classified service shall be removed, discharged or reduced, except for just cause which shall not be political

or religious. No such person shall be removed, discharged or reduced unless the appointing authority first gives him notice person the opportunity to respond. A copy of any such notice of the proposed action and the basis for it and affords such person the opportunity to respond. A copy of any such notice shall immediately be forwarded to the commission. . . .

Within three days after the removal, discharge or reduction, an appeal may be made to the commission, in writing, by the employee so removed, discharged or reduced. The commission, on receiving such notice of appeal, shall set a date for a hearing or investigation of the reasons for the removal, discharge or reduction . . . . The civil service commission, or any committee appointed by said commission, shall conduct the hearing or investigation. The employee appealing shall have full opportunity to be heard and may be represented by counsel of his own choosing or by a duly authorized member of the employee organization of which he is a member . . . . The decisions and findings of the commission, or of the investigation committee, when approved by the commission, shall be final and shall be filed, in writing, with the personnel director and shall be forthwith certified to and enforced by the head of the department or appointing authority. . . . The decisions and findings of the commission referred to in this Section may be appealed from the person adversely affected thereby to any judge of the superior court . . . .

ECF No. 38-8; Section 223.

Bridgeport asserts that David Dunn, who was the Labor Relations Officer for Bridgeport from 1985 to 1990 or 1991, was "an unaffiliated, unclassified employee." ECF No. 32-1 at ¶¶ 7, 18. It further asserts that Dunn's successors in the role, Herbert Grant and Lawrence Osborne, were also "unclassified and appointed to this position." ECF No. 32-1 at ¶ 18. Bridgeport points to Dunn's testimony to support these assertions. Austin argues that "Dunn's statement is an uncorroborated, self-serving statement of an employee of the defendant" and therefore "it cannot, without corroboration, support the defendant's motion for summary judgment, especially since the claim conflicts with the express provisions of § 205 of the city charter." ECF No. 38 at ¶ 18.

### B. Cavalli Trial

On January 19, 2016, Anthony Cavalli, President of the Bridgeport City Supervisors Association ("BCSA"), filed suit against Bridgeport in Connecticut Superior Court. ECF No. 32-1 at ¶ 38; ECF No. 38 at ¶ 38. Austin asserts that Bridgeport had refused to recognize its

obligations under a collective bargaining agreement based on its claim that the agreement had not been properly ratified, ECF No. 38 at 23 ¶ 29, and that Cavalli and BCSA brought the suit to force Bridgeport to comply with the terms of the agreement, *id*. at 23 ¶ 30. Austin was called to testify at the trial about the negotiation of the agreement and the ratification process; he testified on February 25 and 29, 2016. ECF No. 32-1 at ¶ 39; ECF No. 38 at ¶ 39 & 23-24 ¶¶ 31-32. Phil White, another Labor Relations Officer, also testified in this matter. ECF No. 32-1 at ¶ 41; ECF No. 38 at ¶ 41. White is still employed as a Senior Labor Relations Officer. ECF No. 32-1 at ¶ 41; ECF No. 38 at ¶ 41.

Judge Bellis of the Connecticut Superior Court ruled against Bridgeport. ECF No. 38 at ¶ 33. In so ruling, she made the following statements:

> The court vehemently rejects any claims that Mr. McCarthy's or Mr. Austin's acts or testimony may have been influenced by the fact that they would benefit financially from the new contract.

ECF No. 38-10 at 5.

> The Court finds that there is no credible evidence that Messrs. McCarthy or Austin acted adversely to the City's interest, that they acted in a self-serving manner, or that they abandoned the interests of the City. The contract at issue was negotiated by individuals, including Messrs. McCarthy and Austin, at the direction of the City and within the scope of their authority to do so. In fact, it was their job to do so, and it was done with the full knowledge of their employer, the City of Bridgeport.

> And although the City abandoned its position that Mr. McCarthy and Mr. Austin were acting against the interests of the City, the Court notes nonetheless that the City's original position that they were not doing so was not meritorious and frankly does not appear to be made in good faith based upon the evidence that was presented during the trial.

ECF No. 38-10 at 6.

### C. Austin's Termination

Joe Ganim succeeded Bill Finch as Mayor of Bridgeport in December 2015. ECF No. 32-1 at ¶ 42; ECF No. 38 at ¶ 42. After Ganim took office, McCarthy's employment was terminated

and Janene Hawkins became the Director of Labor Relations. ECF No. 32-1 at ¶¶ 8, 46-47; ECF No. 38 at ¶¶ 8, 46-47. Hawkins, in consultation with the City Attorney's office, the Chief Administrative Officer's office, and the Mayor's office, made the decision to terminate Austin. ECF No. 32-1 at ¶ 50; ECF No. 38 at ¶ 50. Austin's employment was terminated on July 8, 2016. ECF No. 32-1 at ¶¶ 4, 48; ECF No. 38 at ¶¶ 4, 48. The termination letter included the following language:

> This letter is official notice that your employment in the Office of Labor Relations is terminated effective immediately in compliance with the authority granted by the Charter of the City of Bridgeport and the rules and regulations of the Civil Service Commission as they relate to unaffiliated, appointed, non-union employees.

ECF No. 32-1 at ¶ 49; ECF No. 38 at ¶ 49; ECF No. 32-8.

On or about September 13, 2016, Austin appealed his termination to the Civil Service Commission on the basis that he was a member of the classified civil service. ECF No. 32-1 at ¶ 52; ECF No. 38 at ¶ 52. His appeal was discussed at the May 9, 2017 Civil Service Commission Regular Meeting. ECF No. 32-1 at ¶ 53; ECF No. 38 at ¶ 53. He was notified on May 11, 2017 that his appeal had been denied. ECF No. 32-1 at ¶ 54; ECF No. 38 at ¶ 54. The Civil Service Commission denied his appeal because it concluded that he was a mayoral appointment and therefore an unclassified employee whose employment was terminated with the change in mayoral administration. ECF No. 32-1 at ¶ 54; ECF No. 38 at ¶ 54.

## II.    LEGAL STANDARDS

The court must grant a motion for summary judgment if the moving party shows "that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id*. In reviewing the record, the court "must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013).

## III.    DISCUSSION

### A.  Violation of the Bridgeport City Charter (Count Four)

Austin alleges that Bridgeport violated the express provisions of the Bridgeport City Charter by terminating him without just cause. ECF No. 1 at ¶¶ 207-50.[1] The City Charter delineates two types of civil service employees: classified and unclassified. ECF No. 32-1 at ¶ 9; ECF No. 38 at ¶ 9. The parties agree that a classified employee cannot be terminated unless such termination is for just cause and the employee is given notice of the termination and an opportunity to appeal and be heard regarding the termination; they also agree that unclassified employees either have fixed tenure of office or serve at the pleasure of the Mayor and may be

---

[1] Although the parties do not brief this issue, it appears that Section 223 of the City Charter allows employees removed from their positions in the classified service to appeal their terminations to the city's civil service commission and then to any judge of the superior court. Because of the federal claims brought in this action, this Court has supplemental jurisdiction over any related state claims. 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.").

terminated because of a change in administration. ECF No. 32-1 at ¶¶ 10-11; ECF No. 38 at ¶¶

10-11. Austin argues that the termination of his employment was a violation of the City Charter

because he was a classified employee terminated without just cause; Bridgeport argues that the

termination was not a violation of the City Charter because Austin was an unclassified employee

and was not entitled to just cause protections.

Section 205(a) of the City Charter sets forth six categories that comprise the unclassified

service and provides that all other positions shall be in the classified service:

> The civil service of the city is hereby divided into the unclassified and classified service.
> The unclassified service shall comprise: (a) The mayor and all officers elected by the
> people; (b) all executive offices or positions specifically created by charter and the
> method of filling which is governed by specific and express provisions of the charter,
> including the civil service commissioners, superintendent of schools, assistant
> superintendent of schools, superintendent of the department of public welfare, with the
> exceptions hereinafter noted; (c) members of boards and commissions appointed by the
> mayor and serving without pay; (d) members of any board or commission appointed by[]
> the city council; (e) all classes of teachers in the school system of the city, so far as their
> original appointments hereto are concerned; (f) the deputy director of public works, the
> assistant city treasurer, the assistant town clerk, the assistant city attorney and the
> assistant city engineer.

> *The classified service shall include all other offices or positions existing at the time of the*
> *passage of this act or thereafter created*, including all positions and offices in the police
> department, including that of chief of police, and all positions and offices in the fire
> department including that of fire chief.

Section 205(a) (emphasis added). Austin argues that because Section 205(a) specifically

enumerates categories of unclassified positions and then states that "[t]he classified service shall

include *all other offices or positions* existing at the time of the passage of this act or *thereafter*

*created*," (emphasis added), any position that does not come within the enumerated categories

and was created after the adoption of the City Charter – like the position of Senior Labor

Relations Officer – must be in the classified service. ECF No. 37 at 4, 9-13 (emphasis added).

Bridgeport disagrees. It argues that "[n]o classified position arises out of the City Charter per se" and that "[s]uch positions must be created by the Civil Service Commission in accordance with the process for establishing classified positions which is set out in the Charter." ECF No. 32-2 at 26. It argues that the position of Senior Labor Relations Officer is therefore unclassified because, in creating the position, Bridgeport did not follow the procedures set forth in Section 206(d) to create a classified position. ECF No. 32-2 at 25-31. This section provides, in relevant part, as follows:

> Whenever the appointing authority of any department desires to establish a new permanent position in the classified service, the personnel director shall make or cause to be made an investigation of the need of such position and report his findings to the commission. If upon consideration of the facts the commission determines that the work of the department can not be properly and effectively carried on without the position, it shall classify and allocate the new position to the proper class after the position has been established by the city council. If the commission determines that the position is not necessary and that the work of the department can be properly and effectively carried on without the position, it shall promptly transmit such determination to the city council. Such determination by the commission shall be final unless the city council, within two months of the date of such disapproving action by the commission, shall by its duly enacted resolution approve the establishment of such position. In such event the final action of the city council shall be promptly transmitted to the commission and the commission shall allocate the position or positions therein  approved to its proper class in the classification plan. . . .

ECF No. 38-5 at 2-3; Section 206(d). Although Austin agrees that these procedures were not followed in creating the position of Senior Labor Relations Officer, ECF No. 32-1 at ¶¶ 12-14; ECF No. 38 at ¶¶ 12-14, he argues that Bridgeport *should* have followed them in light of the language in Section 205(a) and that he should not suffer the consequences of Bridgeport's failure to do so, ECF No. 37 at 9-13.

A full understanding of these provisions in the City Charter and how they interact requires some discussion of the origin and purpose of Bridgeport's civil service system. "Soon after the formation of political parties in this country, the maxim 'To the victor belong the spoils'

became current and its wide application gave birth to the so-called 'spoils system.'" *State ex rel. McNamara v. Civ. Serv. Commn. of City of Bridgeport*, 128 Conn. 585, 588 (1942). This resulted in "political scandals which . . . rocked the nation to its foundation." *Id.* To remedy this state of affairs, "various forms of merit systems [were] adopted . . . to obtain qualified appointees and to ensure them a tenure of office free from interference on political or religious grounds." *Id.* "The civil service amendment to the Bridgeport city charter represents [its] effort along this line." *Id.* at 588-89. The Connecticut Supreme Court has interpreted the Bridgeport City Charter and similar provisions "in view of [this] purpose." *Id*. at 589; *see also Kelly v. City of New Haven*, 275 Conn. 580, 615 (2005) (noting its consideration of "the policy objectives of civil service laws" and that "[s]trict compliance is necessarily required to uphold the sanctity of the merit system . . . . It is strict, not technical, compliance that is required") (internal quotation marks and alterations omitted). Specifically, the Connecticut Supreme Court has determined that where the relevant civil service legislation allocates specific positions to the unclassified service and all other positions to the classified service, then a position that does not fit any of the specifically enumerated unclassified positions necessarily falls in the classified service—even if personnel departments disagree and even if longstanding practice suggests otherwise.

In *McNamara*, for instance, the court interpreted the Bridgeport City Charter, and determined that an assistant tax collector was in the classified service despite a contrary determination by the civil service commission. The plaintiff had been appointed to the position of assistant tax collector in 1926. *McNamara*, 128 Conn. at 587. In 1937, she received a letter from the civil service commission stating that her position had been allocated to the classified service, but in 1941 when her employment was terminated, the civil service commission refused to hear her termination appeal on the ground that she held no position in the classified service

and that it was therefore without jurisdiction. *Id*. at 587-88. Interpreting the same language of the City Charter at issue here, the court stated as follows:

> Reading the act as a whole, the intention to include all city employees who fit into the plan and spirit of the merit system is plain. The exclusions are defined with care and in considerable detail. . . . Immediately following these exclusions is the sentence: 'The classified service shall include all other offices or positions existing at the time of the passage of this act or thereafter created . . .'

*Id*. at 590. This language, the court held, called for application of a principle of statutory construction termed "[e]xpressio unius est exclusio alterius"—meaning that when one or more items of a class are expressly mentioned then others of the same class are excluded. *Id*. Because the plaintiff's position did not appear in the list of exclusions from the classified service, the court determined that she was in the classified service: "No reason has been advanced or discovered why the somewhat similar position held by the plaintiff should not have been mentioned in the list if there had been an intention to exclude it [from the classified service]." *Id*.

The court took a similar approach in interpreting analogous language in the New Haven Charter. *New Haven Police Local 530 v. Logue*, 188 Conn. 290 (1982). There, members of the police department brought suit challenging various appointments, and the court determined that the appointments were to offices in the classified service that had to be filled in accordance with the civil service rules. The court explained its reasoning as follows:

> Appointments and promotions to positions in the classified service are made according to merit and fitness to be determined as far as practicable by competitive examinations. New Haven Charter § 198 (1977). Section 198 lists the positions comprising the unclassified service. 'The classified service shall comprise all positions not specifically included by this section . . . .' Id. The posts held by the defendant officers, not being on the unclassified list, constitute classified positions under the charter.

*Id.* at 299. The court went on to note that concessions by the parties on the issue were irrelevant, because an employee's "status as classified or unclassified is determined as a matter of law by reference to section 198 of the charter." *Id*. at 300. In addition, the court emphasized that "[t]he

department's long practice of continual deviation from the civil service rules cannot override the mandates of the charter." *Id.*

Just a few years before *Logue*, the court applied the same reasoning in interpreting comparable statutory language about the classified and unclassified services in the state system. *Chotkowski v. Connecticut Personnel App. Bd.*, 175 Conn. 1 (1978). The plaintiff in *Chotkowski* was hired to serve as the chief of medicine at the Veterans Home and Hospital and functioned in that capacity, but in his state personnel records he was designated as holding the positions of "special assistant" and "professional specialist" in the unclassified service. *Id.* at 2. Approximately six years later, following correspondence between the state personnel department and the hospital administration as to whether he was improperly in the unclassified service, he was appointed to the position of chief of medicine in the classified service. *Id.* In determining that the re-classification was appropriate, and that the plaintiff must be deemed to have been continuously employed in the classified service since his hiring, the court construed the statutory language as follows:

> Section 5-197 of the General Statutes commands that "(a)ny office or position in the state service, whether full-time or part-time, shall be a position in the classified service, except as hereinafter set forth in this chapter or otherwise specified by statute." The next section of chapter 67, s 5-198, lists twenty exemptions from the classified service. No provision of s 5-198 or any other statute has been brought to our attention as excluding from the classified service the work the plaintiff performed at the hospital from 1969 to 1975. In the absence of statutory authority the hospital administration and the state personnel department were powerless to assign the plaintiff to the unclassified service.

*Id.* at 4. Just as in *McNamara* and *Logue*, the court determined that the plaintiff could not have been in the unclassified service because the statute made clear that all positions were in the classified service except those expressly exempted from it, and none of the exemptions applied to the plaintiff.

Finally, in *State ex rel. Levy v. Pallotti*, 133 Conn. 334 (1947), the court applied the same rationale in determining that a state employee held a position in the classified service despite the attorney general's designation of the position as unclassified. The plaintiff had been appointed "special assistant attorney general" to assist the bank commissioner with the liquidation of state banks in receivership. *Id*. at 335. In the certificate filed with the personnel director, the attorney general designated the plaintiff as being in the unclassified service; when the plaintiff was dismissed, he appealed to the personnel appeal board, which decided that he was in the classified service and that his removal was not in accordance with the statutes. *Id*. at 336. In finding that the plaintiff was in the classified service, the court explained that "[t]he fact that the personnel department, or the attorney general's department, did or did not designate the plaintiff as in the classified service is not of controlling importance. The question is whether he was as matter of law in that service." *Id*. at 337. The court then interpreted the statutory language as follows:

> The act establishing the merit system defines 'classified service' to mean 'any office or position of trust * * * in the state service, whether full-time or part-time, for which compensation is paid, with such exceptions as are stated in section 642e.' Section 641e. It is manifest that at the time the Merit Act became effective the plaintiff occupied a position of trust in the state service for which compensation was paid and that he continued to occupy that position at the time he was dismissed. He was, therefore, in the classified service, unless the position he held came within one of the exceptions designated in the act.

*Id*. at 340. Again, the statutory language was clear that all positions were in the classified service except those expressly excluded—regardless of the designation assigned to the plaintiff by the personnel department or the attorney general. Because the plaintiff's position was not expressly excluded, he was found to be in the classified service. *Id*. at 342.

These cases from Connecticut's highest court all counsel in favor of a finding that Bridgeport lacked the authority to include the position of Senior Labor Relations Officer in the unclassified service. Each of these cases relied on both the "well-settled" interpretative canon

that "when exceptions are explicitly enumerated, courts should not infer additional exceptions," *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Envtl. Protec. Agency*, 846 F.3d 492, 538 (2d Cir. 2017), and the recognition that "the policy objectives of civil service laws" and the need to "uphold the sanctity of the merit system," *Kelly*, 275 Conn. at 617, call for treating every city or state employee not specifically exempted as falling within that system, i.e. as holding a classified position. Here, Section 205(a) explicitly enumerates six categories of unclassified positions, and then states that "[t]he classified service shall include all other officers or positions . . . thereafter created." Because the parties agree that the position of Senior Labor Relations Officer is not explicitly designated as an unclassified position in Section 205(a), ECF No. 32-2 at 26; ECF No. 38 at ¶ 5, and was created after the adoption of the City Charter, ECF No. 32-1 at ¶ 14; ECF No. 38 at ¶ 14, the position must be in the classified service. Despite these undisputed facts and the clear language of Section 205(a), Bridgeport makes a series of arguments that the position is unclassified. I address each below.

Bridgeport argues that the position must be unclassified because "[Austin] has put forth no material evidence whatsoever that the role of Senior Labor Relations Officer was created as a classified position in accordance with the Civil Service Commission requirements" set out in Section 206(d) of the City Charter. ECF No. 32-2 at 26. But the requirements of Section 206(d) must "not [be] considered in isolation; rather, [the Court must] look to the statutory scheme as a whole and place the particular provision within the context of that statute." *King v. Time Warner Cable Inc.*, 894 F.3d 473, 477 (2d Cir. 2018) (internal quotation marks, citations, and alterations omitted); *see also Logue*, 188 Conn. at 297 ("To determine the intent of the [New Haven City] charter, the enactment must be examined in its entirety and its parts reconciled and made operative so far as possible.") (internal quotation marks and alterations omitted). As discussed

above, Section 205(a) delineates between the unclassified and classified services, and places "all . . . offices or positions existing at the time of the passage of this act or thereafter created" in the classified service, except those in the six specifically enumerated categories. That language expressly contemplates the creation of new classified offices and positions. But neither Section 205(a) nor any other provision of the Charter cited by the parties contemplates the creation of new unclassified positions. Again, the unclassified positions are specifically enumerated, and the City Charter limits them to that enumerated set; the City Charter sets forth no authority to create new ones.[2]

The only authority for creating new positions – referenced in Section 205(a) and spelled out in detail in Section 206(d) – relates to classified positions. Specifically, Section 206(d) sets forth a series of procedural steps to establish a new classified position. *See* Section 206(d) ("Whenever the appointing authority of any department desires to establish a new permanent position in the classified service, the personnel director shall . . . "). To be sure, the parties agree that those steps were not followed in creating the position of Senior Labor Relations Officer. They also agree that Austin did not go through "a competitive civil service process to obtain his employment." ECF No. 32-2 at 31. But this means only that Bridgeport did not follow the procedural rules governing its Charter-conferred authority to create and fill a new position in the classified service; it does not mean that it gained new authority to create and fill a position in the unclassified service. Bridgeport cannot confer on itself such authority, *Fennell v. City of Hartford*, 238 Conn. 809, 813 ("[A] city's charter is the fountainhead of municipal powers. . . . The charter serves as an enabling act, both creating power and prescribing the form in which it

_____

[2] Of course, if Bridgeport believes that the position of Senior Labor Relations Officer is better suited to the unclassified service, it can seek to amend the City Charter to put it there.

must be exercised. . . . Agents of a city, including its commissions, have no source of authority

beyond the charter.") (internal quotation marks and alterations omitted), least of all by violating

the rules governing its existing authority. If it were otherwise, the "sanctity of the merit system,"

*Kelly*, 275 Conn. at 615, could be easily undermined. The Mayor or a city department head could

simply appoint anyone to any position in city government—without invoking the procedures of

Section 206(d)—and call the position "unclassified" even if it did not fall into any of the

unclassified categories delineated in Section 205(a). This would run counter to the purpose of the

civil service provisions, which are aimed at "obtain[ing] qualified appointees" and "ensur[ing]

them a tenure of office free from interference on political . . . grounds." *McNamara*, 128 Conn.

at 588.

Bridgeport next argues that Austin "received documentation during the course of his

employment further indicating his non-affiliated[3] status." ECF No. 32-2 at 31. But Bridgeport's

use of the term "non-affiliated" on some paperwork does not make a position unclassified if the

City Charter clearly allocates the position to the classified service, as is the case here. *Pallotti*,

133 Conn. at 337 ("Much of the evidence in the case is concerned with the question whether the

records of the personnel department designated the plaintiff as being in the classified service. . . .

The fact that the personnel department, or the attorney general's department, did or did not

---

[3] Bridgeport frequently states in its briefing that Austin was an "unaffiliated" employee or had a "non-affiliated" status, *see, e.g.*, ECF No. 32-2 at 1, and internal city documents also used that terminology, *see, e.g.*, ECF No. 32-2 at 10 n.9. Bridgeport asserts that "[u]naffiliated is a term of art referring to unclassified employees." ECF No. 32-2 at 4 n.5. It cites Dunn's testimony to support this contention, but Dunn conceded that he could not point to any place in the City Charter where the term was used. ECF No. 32-6 at 6. Moreover, in response to opposing counsel's question about whether the term is used in the civil service regulations, Dunn said: "I don't believe the term 'unaffiliated' is used. Normally it's sometimes considered unclassified." *Id.* Thus, Bridgeport has not suggested that "unaffiliated" or "non-affiliated" are defined anywhere in the City Charter, and the evidence it submits connecting "unaffiliated" with "unclassified" is Dunn's testimony that "[n]ormally it's sometimes considered unclassified."

designate the plaintiff as in the classified service is not of controlling importance. The question is whether he was as matter of law in that service."); *Chotkowski*, 175 Conn. at 4 ("In the absence of statutory authority the hospital administration and the state personnel department were powerless to assign the plaintiff to the unclassified service."). In a similar vein, Bridgeport argues that Austin was an unclassified employee because all previous Senior Labor Relations Officers were considered unclassified political appointees. ECF No. 32-2 at 30; ECF No. 32-1 at ¶¶ 17-19 (relying on Dunn's testimony for the proposition that the position of Senior Labor Relations Officer has always been unclassified). But the "long practice of continual deviation from the civil service rules cannot override the mandates of the charter." *Logue*, 188 Conn. at 300.

Bridgeport also argues that Austin was appointed under Section 1(h) of Chapter 3 of the City Charter, and that such appointees are unclassified and serve at the pleasure of the Mayor. ECF No. 32-2 at 29-30. Section 1(h) provides that "[s]ubject to the availability of funds, the Mayor may appoint such assistants as the mayor deems necessary for the administration of the duties of the office of mayor." To support its contentions that Austin was appointed under this provision and that appointees under this provision are unclassified, Bridgeport cites affidavits from Dunn and Hawkins, ECF No. 32-7 at ¶¶ 4, 7; ECF No. 32-9 at ¶ 3, and testimony from Dunn, ECF No. 32-6 at 8, 15-16. But even if I accept the assertions by Dunn and Hawkins that Austin was appointed under this provision as an "assistant[]" the mayor "deem[ed] necessary for the administration of the duties of the office of mayor," I need not accept their legal conclusions that the position is unclassified. Dunn and Hawkins merely assert their opinion that positions appointed under Section 1(h) are unclassified, but "[o]pinion testimony stating a legal conclusion is not helpful." *New York ex rel. Spitzer v. St. Francis Hosp.*, 94 F. Supp. 2d 423, 428 (S.D.N.Y.

2000). The legal opinion of city employees that appointees under Section 1(h) must be unclassified do not override the dictates of the City Charter.

And here, a review of the City Charter in its entirety indicates that appointees under Section 1(h) do not fall into the unclassified service. As noted above, the Court must "look to the statutory scheme as a whole and place the particular provision [to be interpreted] within the context of that statute." *King*, 894 F.3d at 477 (internal quotation marks, citations, and alterations omitted). The City Charter explicitly places certain positions that are appointed by the Mayor or by other appointing authorities in the unclassified service. For instance, Section 2 of Chapter 7 of the City Charter provides that "[t]he mayor may appoint a deputy city attorney . . . [t]he mayor may appoint such assistant city attorneys to such positions as have been created by the city council . . . [t]he deputy city attorney and the assistant city attorneys shall be in the unclassified service." *See also* Chapter 18, Section 2 ("The head of the department [of planning and economic development] . . . shall be appointed by and serve at the pleasure of the mayor."); Chapter 20, Section 2 ("The head of the department [of health and social services] . . . shall be appointed by and serve at the pleasure of the mayor."); Chapter 12, Section 2 ("The head of the department of public facilities . . . shall be appointed by and serve at the pleasure of the mayor."). All these provisions are consistent with Section 205(a), which enumerates as one of the six categories of unclassified positions "all executive offices or positions specifically created by charter and the method of filling which is governed by specific and express provisions of the charter."[4] Unlike these provisions, which expressly place certain appointed positions in the unclassified service, the text of Section 1(h) merely says that the Mayor may appoint certain

---

[4] As noted, Bridgeport concedes that the position of Senior Labor Relations Officer is not such an office or position. ECF No. 32-2 at 26.

"assistants"; it does not say whether those assistants are classified or unclassified or whether they serve at the pleasure of the Mayor. If all employees appointed by the Mayor were necessarily unclassified, as Bridgeport suggests, the language expressly placing the deputy city attorney and the assistant city attorneys in the unclassified service, as well as the other provisions stating that the holder of a particular position "serve[s] at the pleasure of the mayor," would be superfluous. "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks omitted).

In sum, the parties do not dispute that the position of Senior Labor Relations Officer does not fall into any of the unclassified categories set forth in Section 205(a), ECF No. 32-2 at 26; ECF No. 38 at ¶ 5, and that the position came into existence after the adoption of the City Charter, ECF No. 32-1 at ¶ 14; ECF No. 38 at ¶ 14. In light of the City Charter's plain text and structure, standard interpretive principles, and cases interpreting similar language, these are the only two material facts and they show that Austin was a classified employee as a matter of law. Bridgeport's motion for summary judgment as to count four is therefore DENIED. In addition, Rule 56(f) permits the Court to "grant summary judgment for a nonmovant" after "giving notice and a reasonable time to respond." Fed. R. Civ. P. 56(f). In light of the foregoing analysis, Bridgeport shall have 21 days from the date of this order to show cause why the Court should not enter summary judgment as to liability in favor of Austin on count four.

### B. Due Process Rights Under the Fourteenth Amendment (Count Two)

Austin alleges that Bridgeport violated his Fourteenth Amendment procedural due process rights by terminating him without providing notice or a hearing. ECF No. 1 at ¶¶ 101-147. "To determine whether a plaintiff was deprived of property without due process of law in

violation of the Fourteenth Amendment, [the court] must first identify the property interest involved. Next, [the court] must determine whether the plaintiff received constitutionally adequate process in the course of the deprivation." *O'Connor v. Pierson*, 426 F.3d 187, 196 (2d Cir. 2005). Bridgeport argues that it is entitled to summary judgment on this claim because the undisputed evidence establishes that Austin did not have a property interest in his employment, and that even if he did, he was not deprived of due process.

### 1. *Property Interest*

"A public employee has a property interest in continued employment if the employee is guaranteed continued employment absent 'just cause' for discharge." *Ciambriello v. County of Nassau*, 292 F.3d 307, 313 (2d Cir. 2002); *see also O'Connor*, 426 F.3d at 196 ("[I]t is well established that the state-law property interest of government employees who may only be discharged for cause . . . is a constitutionally protected property interest for purposes of the Fourteenth Amendment."). The undisputed facts show that Austin was a classified employee, *see* Section III.A, and was therefore guaranteed continued employment absent "just cause," *see* Section 223 ("No person or employee holding a permanent office or position in the classified service shall be removed, discharged or reduced, except for just cause . . . "). Thus, summary judgment for Bridgeport is not warranted on this ground.

### 2. *Constitutionally Adequate Process*

Bridgeport argues that even if Austin was a classified employee, he was not deprived of due process because he had the right to bring an action in this Court. ECF No. 32-2 at 32. In advancing this position, Bridgeport relies on *White v. City of Bridgeport*, 2016 WL 1170904 (D. Conn. 2016), a case that also concerned the termination of a classified employee of Bridgeport. In *White*, Bridgeport claimed that it eliminated the plaintiff's position to make its operations

more efficient; the court explained that although pre-termination and post-termination hearings are generally required before terminating an employee with a constitutionally protected interest in his employment, a different rule applies where the employer is eliminating a position to make its operations more efficient. *Id*. at *5. In that situation, "a pre-termination hearing is required only if the employee protests the notice of elimination of his position and contends that it is but a sham and pretext for the deprivation of his property right." *Id*. (internal quotation marks omitted). Because the plaintiff's position in *White* was purportedly eliminated for efficiency reasons and the plaintiff did not take the necessary steps to seek a pre-termination hearing, the court determined that Bridgeport had no obligation to provide him with one. *Id*. at *6. The court then went on to explain that the plaintiff was not deprived of due process even though he was deprived of a *post*-deprivation hearing because he retained the opportunity to seek such relief in state court; it is this determination that Bridgeport invokes in arguing that Austin was not deprived of due process because of his right to bring a claim in this Court. *Id*. at *7; ECF No. 32-2 at 32.

But, of course, the *White* court did not say that Bridgeport could eschew a pre-termination hearing in a case—like this one—where it has not claimed that Austin's position was eliminated for efficiency reasons. Thus, the standard rule applies, and Austin was entitled to a pre-termination hearing. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("We have described the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest. This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.") (internal quotations marks and citations omitted). Bridgeport does not dispute that Austin did not receive notice or a pre-

termination hearing, and the evidence shows he did not. ECF No. 38-14 at 3-4 (Hawkins agreeing with opposing counsel that no one informed Austin of the reasons for his termination).

\* \* \*

Because the undisputed facts show that Austin was a classified employee with just cause protections, and that he was not provided a pre-termination notice or hearing, it appears that summary judgment in favor of Austin is warranted. Thus, Bridgeport's motion for summary judgment as to count two is DENIED, and Bridgeport shall have 21 days from the date of this order to show cause why the Court should not enter summary judgment as to liability in favor of Austin on this count.

### C. Retaliation for Exercising Free Speech Rights Under Section 1983 (Count One)

Austin alleges that Bridgeport violated his rights by terminating his employment in retaliation for his exercise of free speech rights. ECF No. 1 at ¶¶ 39-100. To make out a *prima facie* claim of free speech retaliation under § 1983, Austin must "bring[] forth evidence showing that [1] he has engaged in protected First Amendment activity, [2] he suffered an adverse employment action, and [3] there was a causal connection between the protected activity and the adverse employment action." *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (internal quotation marks and citation omitted). Bridgeport does not dispute that Austin suffered an adverse employment action, but argues that it is entitled to summary judgment because Austin was not engaged in protected speech and because there was no causal connection between his speech and his termination.

#### 1. Protected Speech

The constitutional protections accorded to public employee speech depend on "whether the employee spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S.

410, 418 (2006) (internal citations omitted). This inquiry turns on "(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke as a citizen rather than solely as an employee." *Jackler v. Byrne*, 658 F.3d 225, 235 (2d Cir. 2011) (internal quotation marks omitted).

"Whether speech is on a matter of public concern, which is a question of law, is to be answered by the court after examining the content, form, and context of a given statement, as revealed by the whole record." *Id*. (internal quotation marks omitted). "To constitute speech on a matter of public concern, an employee's expression must be fairly considered as relating to any matter of political, social, or other concern to the community." *Id*. at 236 (internal quotation marks omitted). Speech that "primarily concerns an issue that is personal in nature and generally related to [the speaker's] own situation, such as his or her assignments, promotion, or salary, does not address matters of public concern." *Id.* (internal quotation marks omitted). It is undisputed that Austin's testimony in the Cavalli lawsuit concerned the City's rejection of a collective bargaining agreement. ECF No. 32-1 at ¶¶ 38-39; ECF No. 38 at ¶¶ 38-39. The agreement governed Bridgeport's relationship with the Bridgeport City Supervisors Association, ECF No. 32-1 at ¶ 38; ECF No. 38 at ¶ 38, and the Bridgeport City Council was required to approve or reject it. ECF No. 38-10 at 4. Because such an agreement governs the city's relationship with a set of employees, has significant financial implications for the city, and requires City Council approval, testimony about the agreement was on a matter of public concern.

First Amendment protection will therefore attach if Austin spoke as a citizen. In *Garcetti*, the seminal case addressing this issue, the Supreme Court explained that "when public employees make statements pursuant to their official duties, the employees are not speaking as

citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. Nearly a decade later, the Court revisited the issue in *Lane v. Franks*, when it considered "whether the First Amendment . . . protects a public employee who provided truthful sworn testimony, compelled by subpoena, outside the course of his ordinary job responsibilities." 573 U.S. 228, 231 (2014).

In *Lane*, the plaintiff-petitioner Edward Lane had been hired as the director of a statewide program for underprivileged youth. *Id.* at 231-32. In his capacity as director, he was responsible for overseeing the program's day-to-day operations, hiring and firing employees, and making decisions with respect to the program's finances. *Id.* at 232. In the course of conducting an audit, Lane discovered that an elected state representative employed by the program was committing fraud and fired her. *Id.* He testified against the representative before a grand jury and at trial. *Id.* at 233. Lane was subsequently terminated and brought suit, alleging that he had been fired in retaliation for his testimony against the representative. *Id.* at 234. The Eleventh Circuit relied extensively on *Garcetti* and determined that Lane did not enjoy First Amendment protection because he was acting pursuant to his official duties when he investigated the representative and fired her; it further explained that testifying about his official activities pursuant to a subpoena did not bring the speech within the protection of the First Amendment. *Id.* at 235. The Supreme Court reversed. It explained that:

> [T]he Eleventh Circuit read *Garcetti* far too broadly. It reasoned that, because Lane learned of the subject matter of his testimony in the course of his employment . . . , *Garcetti* requires that his testimony be treated as the speech of an employee rather than that of a citizen. It does not.

*Id.* at 239 (internal citation omitted). Rather, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* at 240. With respect to testimony during a trial, it explained that

"[s]worn testimony in judicial proceedings is a quintessential example of speech as a citizen for a simple reason: Anyone who testifies in court bears an obligation, to the court and society at large, to tell the truth." *Id.* at 238. The Court concluded that "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes. That is so even when the testimony relates to his public employment or concerns information learned during that employment." *Id.* It expressly declined to decide, however, "whether truthful sworn testimony would constitute citizen speech under *Garcetti* when given as part of a public employee's ordinary job duties." *Id.* at n.4.

Bridgeport contends that Austin "was testifying as a function of his position," ECF No. 32-2 at 17, and points to statements in Dunn's and Hawkins's affidavits that "[p]articipating and explaining labor negotiations during adjudicative hearings are tasks that a Senior Labor Relations Officer is expected to do as an official job responsibility," ECF No. 32-1 at ¶ 40; ECF No. 32-7 at ¶ 12; ECF No. 32-9 at ¶ 8. But even if Austin was expected to testify "as an official job responsibility," the question after *Lane* is whether Austin's *ordinary* job responsibilities included testifying in court proceedings. *Lane*, 573 U.S. at 238 n.4 ("It is undisputed that Lane's ordinary job responsibilities did not include testifying in court proceedings. For that reason, Lane asked the Court to decide only whether truthful sworn testimony that is not a part of an employee's ordinary job responsibilities is citizen speech on a matter of public concern.") (internal citation omitted); *Hagan v. City of New York*, 39 F. Supp. 3d 481, 510 (S.D.N.Y. 2014) ("The use of the qualifier ordinary—which does not appear in *Garcetti* or any other case on point—both sharpens the inquiry and arguably signal[s] a narrowing of the realm of employee speech left unprotected by *Garcetti*. The question is not whether an employee's speech is made pursuant to *any* official duty, but whether it is made pursuant to one of his ordinary official duties.") (internal quotation

marks and citation omitted); *Seifert v. Unified Govt. of Wyandotte County/Kansas City*, 779 F.3d 1141, 1152 (10th Cir. 2015) (finding that the testimony of a reserve deputy during a civil rights trial brought by a former criminal defendant, concerning matters observed while the deputy was on duty, was protected speech under the First Amendment because "the testimony [the deputy] gave at the . . . trial was nothing like the routine testimony of law-enforcement agents in support of criminal prosecutions").

Austin denies that testifying in court came within his job responsibilities and cites his own deposition testimony to support this contention. ECF No. 38 at ¶ 40; ECF No. 37 at 31. He argues that his "duties did not regularly include appearing in court to provide testimony," ECF No. 37 at 31, and explained his job responsibilities as follows:

> Q. Can you describe for me your job responsibilities as labor relations officer for the City of Bridgeport?
>
> . . .
>
> A. Yes. My job was primarily, as I think you indicated, to deal with the police department. It was thought that once I acclimated myself to the police department there was – depending on the workload, to then take over the fire department, to do all the uniform services. Once I acclimated myself to the police department. Bridgeport enjoys two police departments, actually three. They have the board of education police and the park police. The numbers are dwindling, but I took over those and occasionally would also work over on fire-related matters. Taking over the fire department completely never came to fruition because in addition to the various police departments, I was involved in NAGE, National Association of Government Employees, and working on their matters and a little bit of the nurse's union.

ECF No. 38-12 at 13-14. Thus, the conflicting testimony of Hawkins and Dunn on the one hand and Austin on the other raises a factual dispute as to the central question: whether testifying in

court was within "the scope of [Austin's] ordinary job duties." *Lane*, 573 U.S. 228, 238.[5] Accordingly, summary judgment is not warranted on this ground.

### 2. *Causal Connection*

Bridgeport next argues that Austin fails to point to evidence of a causal connection between his speech and his termination. ECF No. 32-2 at 21-23. "To establish causation, a plaintiff must show that his protected activity was a substantial motivating factor in the adverse employment decision. This may be done either directly, by evidence of retaliatory animus, or indirectly, by circumstantial evidence, such as by showing that the protected activity was closely followed in time by the adverse employment decision." *Bierce v. Town of Fishkill*, 656 Fed. Appx. 550, 552 (2d Cir. 2016) (internal quotation marks and citations omitted). In this case, Austin argues that "the time between [his] testimony on February 29, 2016, and his termination on July 8, 2016, just over four months, establishes the temporal proximity necessary for proving a causal connection between the plaintiff's speech and his termination." ECF No. 37 at 34. He further notes that the "time between Judge Bellis' decision on March 21, 2016, and the plaintiff's termination is just over three months." *Id.*

"[The Second] Circuit has declined to draw a bright line as to how close in time the events must be" to establish causation. *Brandon v. Kinter*, 2019 WL 4263361, at *14 (2d Cir. 2019). Rather, courts must exercise their "judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). The Circuit has held that, in some circumstances, periods of time greater

---

[5] There is no dispute that Austin participated in the state court proceedings as a subpoenaed witness. ECF No. 32-1 at ¶ 39; ECF No. 38 at ¶ 39. As *Lane* explained, the First Amendment "protects a public employee who provide[s] truthful sworn testimony, *compelled by subpoena*, outside the course of his ordinary job responsibilities." 573 U.S. at 231 (emphasis added).

than four months suffice to make out a *prima facie* claim. *Id.* (inferring causation based on a six-month lapse between protected speech and alleged retaliatory actions); *Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 555 (2d Cir. 2001) (same based on five-month lapse); *Kiernan v. Town of Southampton*, 734 Fed. Appx. 37, 43 (2d Cir. 2018) ("No bright line defines the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, but a causal inference may be drawn when the speech and adverse action occur within a five-month period.") (internal quotation marks omitted).

Here, the content of the ruling by Judge Bellis provides important context. In her ruling, Judge Bellis admonished Bridgeport for its depiction of Austin's conduct:

> The court vehemently rejects any claims that Mr. McCarthy's or Mr. Austin's acts or testimony may have been influenced by the fact that they would benefit financially from the new contract.
>
> . . .
>
> The Court finds that there is no credible evidence that Messrs. McCarthy or Austin acted adversely to the City's interest, that they acted in a self-serving manner, or that they abandoned the interests of the City. The contract at issue was negotiated by individuals, including Messrs. McCarthy and Austin, at the direction of the City and within the scope of their authority to do so. In fact, it was their job to do so, and it was done with the full knowledge of their employer, the City of Bridgeport.
>
> And although the City abandoned its position that Mr. McCarthy and Mr. Austin were acting against the interests of the City, the Court notes nonetheless that the City's original position that they were not doing so was not meritorious and frankly does not appear to be made in good faith based upon the evidence that was presented during the trial.

ECF No. 38-10 at 6; ECF No. 38 at ¶¶ 33-38. These comments by Judge Bellis that Bridgeport's position with respect to Austin "[did] not appear to be made in good faith" were made three months before Austin's termination and portrayed Bridgeport in a poor light. In this context, a four-month lapse between the protected conduct and the termination is sufficient to permit an inference of causation.

Once the plaintiff establishes a *prima facie* case, "the defendant has the opportunity to show by a preponderance of the evidence that it would have taken the same adverse employment action even in the absence of the protected conduct." *Nagle v. Marron*, 663 F.3d 100, 105 (2d Cir. 2011). Bridgeport does not attempt to make such a showing here.[6] Thus, it has not carried its burden of showing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law on this ground. Summary judgment as to count one is DENIED.

### D. Retaliation for Exercising Free Speech Rights Under Conn. Gen. Stat. § 31-51q (Count Three)

Section 31-51q of the Connecticut General Statutes provides a cause of action for violation of the right to free speech under both the United States and Connecticut Constitutions. It reads, in relevant part, as follows:

> Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee . . .

Conn. Gen. Stat. Ann. § 31-51q. To succeed on a claim under this statute, Austin must show that:

> (1) he was exercising rights protected by the First Amendment to the United States Constitution (or an equivalent provision of the Connecticut Constitution); (2) he was fired on account of his exercise of such rights; and (3) his exercise of his First Amendment rights did not substantially or materially interfere with his bona fide job performance or with his working relationship with his employer.

---

[6] Bridgeport notes in a different portion of its brief that "Austin admitted to making mistakes" and that "Austin prevented the city council from understanding the consequences of tabling voting on the BCSA agreement at two meetings by his omission." ECF No. 32-2 at 21. And Hawkins states that she "began to have serious concerns about [Austin's] truthfulness in his role, particularly with regard to his role with the police union." ECF No. 32-9 at ¶ 5. But Bridgeport does not argue that it terminated Austin for these reasons.

*Trusz v. UBS Realty Inv'rs*, 2010 WL 1287148, at *9 (D. Conn. Mar. 30, 2010).[7]

As to the first element of this claim, there is a genuine issue of material fact as to whether testifying in court was part of Austin's ordinary job responsibilities. Section III.C.1. Because this dispute precludes a finding that Austin's testimony was unprotected by the First Amendment, summary judgment is not warranted on this ground.[8] As to the second element, a four-month lapse between the allegedly-protected conduct and Austin's termination is sufficient to permit an inference of causation in the circumstances of case. Bridgeport does not address the "substantial[] or material[] interfere[nce]" issue. Accordingly, Bridgeport's motion for summary judgment is DENIED as to count three.

## IV. CONCLUSION

For the reasons set forth above, Bridgeport's motion for summary judgment is DENIED, and Bridgeport shall have 21 days to show cause why the Court should not enter summary judgment as to liability in favor of Austin on counts two and four.

IT IS SO ORDERED.

        ___/s/_____
         Michael P. Shea, U.S.D.J.

Dated:     Hartford, Connecticut
       September 23, 2019

---

[7] The Court notes that, in the absence of binding precedent, state and federal trial courts have split on whether the plaintiff or the defendant bears the burden with respect to the substantial or material interference issue. *Matthews v. Dept. of Pub. Safety*, 2013 WL 3306435, at *8 (Conn. Super. May 31, 2013) (noting that "no appellate authority has weighed in on this issue"). I need not resolve this issue here.

[8] Bridgeport argues that Austin's testimony was not protected speech under Connecticut law, ECF No. 32-2 at 20-21, but the Court need not address this argument because a claim under Section 31-51q may be premised on "rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state." Conn. Gen. Stat. Ann. § 31-51q. (emphasis added).